IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

VELVIA YOUNG,

    Plaintiff,

    v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

CIVIL ACTION

NO. 1:07-CV-1612-GGB

## FINAL ORDER

Plaintiff, Velvia Young, brings this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff's claim for disability insurance benefits.  Plaintiff returned to work in September 1999.  She seeks benefits only for the closed period from August 1994 through September 1999.  (Tr. 382).  Plaintiff's age during this time period ranged from 33 to 38 years.

## I.     ADMINISTRATIVE BACKGROUND

Plaintiff filed an application for disability insurance benefits in October 1994, alleging disability since August of that year.  (Tr. 58).  After her application was denied  initially  and  on  reconsideration,  she  requested  a  hearing  before  an

Administrative Law Judge ("ALJ"), and one was held before ALJ Carmen Cintron in December of 1996. (Tr. 29). Judge Cintron denied benefits in February 1997, and the Appeals Council denied review. (Tr. 9, 4). Plaintiff then filed an appeal in this Court. Magistrate Judge C. Christopher Hagy recommended affirming the denial of benefits. However, in December 1999, United States District Judge Richard Story rejected that recommendation and remanded the case to the Commissioner for a further hearing with regard to Plaintiff's ability to perform work at the medium exertional level and to include Plaintiff's concentration deficiencies in the hypothetical question posed to the vocational expert. (Tr. 242).

After remand, ALJ Kathleen McGraw held a hearing in March 2002 and denied benefits in July of that year. (Tr. 196, 207). Plaintiff again appealed the Commissioner's denial of benefits. In June 2003, United States District Judge G. Ernest Tidwell approved a consent order remanding the case for a second time and directing the ALJ to reassess Plaintiff's level of education and intellectual functioning, and to obtain appropriate testimony from a vocational expert. (Tr. 335-36).

Following this second remand, ALJ Charles Murray held a third administrative hearing in June 2006 and denied benefits in August of that year. (Tr. 318, 377). Thereafter, the Appeals Council denied Plaintiff's request for review. (Tr. 304).

AO 72A
(Rev.8/82)

Plaintiff filed her third appeal in this Court on July 11, 2007, which is currently before me for resolution.[1]

## II. FACTS

### A. Documentary Evidence

Plaintiff's brief accurately details the documentary evidence that was before ALJ Murray in 2006, and there is no need to present it here in the level of detail provided by Plaintiff. Only certain portions of the evidence will be summarized.

Plaintiff has a history of bilateral carpal tunnel syndrome and had surgery on one wrist in 1991 and on the other, in 1992. Although the surgery initially relieved her symptoms, the symptoms returned in 1994, at which time she received additional treatment.

In a Disability Report dated October 6, 1994, Plaintiff stated that her daily activities included washing clothes, cooking dinner, washing dishes, dusting, preparing her children's clothes, and helping her children with homework. (Tr. 86).

In April 1997 a doctor, whose signature is illegible, reported that Plaintiff had bilateral carpal tunnel syndrome. The doctor opined that Plaintiff could never lift

_____

[1]The parties consented to jurisdiction by a magistrate judge. (See Doc. 14).

AO 72A
(Rev.8/82)

more than five pounds and could lift five only "occasionally" (from very little up to one-third of an eight-hour day), but that she could "frequently" (from one-third to two-thirds of an eight-hour day) lift less than five pounds. The doctor also believed that Plaintiff would have difficulty maintaining a good grip if she were required to climb. (Tr. 175-77).

In September 1996, Plaintiff underwent a consultative psychological examination by Robert Shepherd, Ph.D. Dr. Shepherd noted that Plaintiff seemed "somewhat depressed," but that she was not demented. He also concluded that she was functionally illiterate. (Tr. 163). Plaintiff's IQ scores were 72 verbal, 76 performance, and 73 full-scale. Dr. Shepherd diagnosed Plaintiff with borderline intellectual functioning and stated that she could read and spell at the second grade level, and do math at the fifth grade level. (Tr. 163-64, 166). Plaintiff told Dr. Shepherd that she attempted to read the newspaper, the Bible, and "several other things," but that her "mind goes blank and I don't remember anything." (Tr. 165). In connection with his evaluation, Dr. Shepherd completed a "Medical Assessment Of Ability To Do Work-Related Activities (Mental)," in which he opined that Plaintiff was "fair" (defined as "seriously limited, but not precluded") in up to eight different

4

areas of work-related mental functioning and "good" (defined as "limited, but satisfactory") in up to seven different areas. (Tr. 168-69).

In August 2005, Plaintiff saw Carla Hedeen, Ph.D., for a consultative psychological examination. Dr. Hedeen noted that Plaintiff, in spite of some anxiety, made a good effort to complete the testing and concluded that the test results "should be interpreted as a valid and reliable estimate of her current psychological functioning." (Tr. 351). Dr. Hedeen administered a second IQ test and obtained scores close to those of Dr. Shepherd: 70 verbal, 77 performance, and 71 full-scale. (Tr. 350-51, 163). She also administered an achievement test, obtaining the same scores Dr. Shepherd: 47 reading, 53 spelling, and 74 arithmetic.

According to Dr. Hedeen, Plaintiff reported intermittent problems with depression and carpal tunnel symptoms, which caused her to miss work periodically. Overall, however, Plaintiff "ha[d] been a reliable employee at her caretaking job." (Tr. 349-50). Plaintiff was "too nervous to drive" and had never obtained a driver's license. (Tr. 350). She reported that, "[d]ue to problems with reading, she needs to have complex instructions read to her but is able to follow them if explained to her." (Tr. 350). Objective testing showed that Plaintiff "had difficulty with verbal abstraction [and] auditory memory." (Tr. 352, 351). Dr. Hedeen concluded that, in

5

general, Plaintiff would have no problems with attention, concentration, maintenance of production norms, adaptation to work stress, and working full time. "However, at times when her transient depressive symptoms are apparent she may have difficulty." (Tr. 352).

Plaintiff's school records, dating from 1974 to 1977, show that she graduated from high school with an overall grade point average of 2.44. She was not in special education classes.

### B. First Administrative Hearing and Order of Remand

#### 1. Plaintiff's Testimony

At the 1996 administrative hearing, Plaintiff testified that she had completed high school and had worked for 16 years as a clerk for Rich's Department Stores, where she keyed numbers into a computer 8 to 12 hours per day. As noted above, Plaintiff had carpal tunnel release surgery on her wrists in 1991 and 1992. After recuperating from these surgeries, she returned to her job at Rich's and stayed in that position until August 1994. At the time of the 1996 hearing, Plaintiff was still having problems with her hands and she wore wrist splints as a result. Plaintiff testified that her hands hurt every day but were better on some days than others. She took 800 mg

AO 72A
(Rev.8/82)

of Motrin for the pain at least once every day and took additional Motrin about three days per week. "It all depends on how much work I do . . . around the house and stuff." She wore wrist splints unless she needed to take them off to wash dishes or perform other tasks such as writing. (Tr. 48-49).

In addition to pain, Plaintiff testified that her wrists, fingers, and arms swell up and become numb. She had difficulty opening cans and tended to drop things due to numbness in her hands. (Tr. 36-37). She found it difficulty to button her blouse, use a knife and fork, and tie her shoelaces. Plaintiff could perform activities such as packing light items in a box, or writing, but only for short periods of time, because "my hands will start hurting real bad." (Tr. 38-39).

In early 1996, Plaintiff tried part-time work as a home health care aide for elderly patients. She was required to bathe and lift the patients, to prepare their meals, and to perform housework. Plaintiff had to discontinue this job after two months "because my hands started bothering me real bad." She tried again later in 1996, but had to stop for the same reason after only one day. (Tr. 34-36).

Plaintiff suffered from headaches about three times per week, some of which were "bad." About twice per week she would have to lie down for four or five hours at a time to relieve her headaches. Plaintiff sometimes felt depressed and could not

AO 72A
(Rev.8/82)

fall asleep until around 4:00 in the morning. About three days per week, Plaintiff awoke feeling bad and did not want to get out of bed. Plaintiff never sought or received mental health care and did not take any medication for depression. (Tr. 40-41). Her doctors had advised her to take Tylenol for her headaches. (Tr. 49).

At the time of the 1996 hearing, Plaintiff had two children, ages 2 and 11. Plaintiff's husband took the younger child to day care five days per week and generally picked up both children later in the day. (Tr. 43). Plaintiff had never tried to get a driver's license, but she was able to use public transportation. (Tr. 42).

Plaintiff testified that she could perform light household chores such as cleaning, cooking, and laundry, but only "until . . . my hands start bothering me." Plaintiff's older child helped with some cooking, and Plaintiff went grocery shopping with her husband about once every two weeks. Plaintiff also attended church two to four days per week. (Tr. 44-47). On some days, she was too depressed to cook dinner or to do other household chores. Her good and bad days were about equal in number. (Tr. 50). Plaintiff still occasionally went to movies with her husband, but had given up her former hobbies of bowling, skating, and crossword puzzles. She could garden for only a few minutes at a time "because my hands started bothering me." (Tr. 48).

AO 72A
(Rev.8/82)

Plaintiff could read parts of a newspaper, but sometimes when she starts reading "my mind just go blank. Some words I can understand, some I can't." (Tr. 51).

## 2.    Findings of the ALJ and the District Court

The first ALJ found that Plaintiff had the following "severe" impairments: "bilateral DeQuervain's tenosynovitis, borderline intellectual functioning, anxiety and depression." (Tr. 13, 18). She noted that Plaintiff has a high school education but found her to be functionally illiterate. (Tr. 19). The ALJ concluded that Plaintiff's impairments did not prevent her from work involving a medium level of exertion and simple tasks, provided she was not required to engage in repetitive use of her hands. (Tr. 17, 18). The ALJ found that these restrictions would not prevent Plaintiff from performing her past work as a nurse assistant, and that she could also perform alternative jobs identified by a vocational expert. (Tr. 17-19).

Upon review of the ALJ's decision in 1999, District Judge Story found that the record did not contain substantial evidence supporting a finding that Plaintiff could perform work requiring a medium level of exertion. He directed the Commissioner, on remand, to develop a full and fair record regarding Plaintiff's ability to perform

AO 72A
(Rev.8/82)

medium work, and to include Plaintiff's concentration deficiencies in a hypothetical question to the vocational expert. (Tr. 241-42).

### C.    Second  Administrative Hearing and Order of Remand

#### 1.    Testimony

At the second administrative hearing, held in March 2002, Plaintiff testified that her data entry work at Rich's had involved "a lot of writing." (Tr. 218).  Before departing for maternity leave in July or August of 1994, Plaintiff's hands had started to bother her again.  For this reason, she did not return to her job at Rich's and did not try any other work until her son was almost a year old.  (Tr. 219-20).

In September 1999, Plaintiff returned to work as a home healthcare aide.  She helped bathe and dress her client, helped her get out of bed, made her bed, and took care of her feeding tube.  Plaintiff did not, however, lift her client, clean her  house, or prepare meals.  (Tr. 213-14, 224-25).  Plaintiff testified that she could not have done the same work prior to September 1999 "because my hands and my wrists they would get numb and they bothered me real bad." (Tr. 214).

Plaintiff further testified that, during her period of unemployment, from 1994 to 1999, she had experienced "half and half" good and bad days.  On good days, she

could button her blouse and fix her hair, but not on bad days. She needed help from others to bathe her baby and to change his diaper. She also had difficulty using a knife and fork, tying her shoelaces, and manipulating small objects like coins. (Tr. 222-24). Plaintiff attributed the eventual improvement in her wrists and hands to "resting."

For a time in the mid-1990's, Plaintiff's depression reduced her ability to function about three days per week. On these days, "I wouldn't get out of bed. I'd just lay around, I wouldn't put on clothes." When Plaintiff returned to work in 1999, her depression went away, but it returned when the pain in her wrists forced her to quit. (Tr. 215-16). Plaintiff never received treatment for her depression, and did not recall her doctor advising her to do anything about it except to "rest." (Tr. 216-17, 221). Plaintiff's counsel pointed out, however, that a medical record showed that Plaintiff had been prescribed Restoril and Prozac by one doctor in 1995, who had concluded that she suffered from anxiety and depression. (Tr. 222, 159).

A vocational expert ("VE") also testified at the second administrative hearing. He stated that, even if Plaintiff's mental abilities were as limited as described by Dr. Shepherd, Plaintiff could still perform a significant number of jobs. (Tr. 234).

11

## 2.    Findings of the ALJ

ALJ McGraw rejected Dr. Shepherd's limitations and determined that Plaintiff was only moderately limited in concentration, persistence, and pace. (Tr. 202-03). She found that, during the relevant time period, Plaintiff experienced mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and had experienced no episodes of decompensation which would have prevented her from engaging in substantial gainful employment. (Tr. 202).

ALJ McGraw concluded that Plaintiff had suffered from the following "severe" impairments: "bilateral carpal tunnel syndrome (CTS); anxiety and depression; and borderline intellectual functioning (BIF)." (Tr. 201, 205). Although Plaintiff had "a 'high school (or high school equivalent) education,'" she had "achieved only to the marginal level." (Tr. 205). The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform simple work with unlimited standing, walking, and sitting; that she could lift five pounds occasionally and less than five pounds frequently; and that she had the ability to do unlimited gross manipulation, as well as fine manipulation up to one third of a work day. (Tr. 203, 205). For these reasons, the ALJ concluded that Plaintiff could not perform her past work from 1994 to 1999,

12

but that she could have worked as a cashier, a surveillance system monitor, a laundry classifier, or a gate guard during this time period.  (Tr. 203-06).

### 3.    District Court Proceedings

After the second appeal of this case to this Court, Plaintiff and the Commissioner signed and submitted to Judge Tidwell a consent order in which they agreed that the case should be remanded.  Judge Tidwell signed the order, which states, in pertinent part:

> The ALJ will schedule a supplemental hearing, and Plaintiff will be allowed to testify and present evidence. The ALJ will re-assess Plaintiff's level of education and intellectual functioning and give reasons for the decision. The ALJ will obtain vocational expert testimony, and the hypothetical question should accurately reflect all of Plaintiff's limitations established by the record as a whole.

(Tr. 335-36).

### D.    Third Administrative Hearing and ALJ Findings

### 1.    Testimony

At the third administrative hearing, held in June 2006, Plaintiff testified that she had not returned to work after giving birth to her son because she had been "going

back and forth to the doctor" regarding her carpal tunnel syndrome. (Tr. 388). She did not believe that she could have worked even if she had not been pregnant because the work "was real bad on my hands" and she had been told by her doctor that if she kept working on a computer her hands would keep bothering her. (Tr. 388). She stated that she also suffered from depression and headaches during this time period. She did not want to get out of bed or do anything and stayed in bed half the days of the week.

When asked if she could read a newspaper, Plaintiff testified that she could read "maybe some of it, but probably not all of it." She could also read some, but not all, words in letters from the Social Security Administration and in Christmas and birthday cards. (Tr. 387, 394).

At the time of the 2006 hearing, Plaintiff was working as an in-home aide for an elderly client. In that job, Plaintiff prepared two light meals per day, washed dishes, helped her client dress, and pushed her outdoors in a wheelchair. Mostly, though, "we just sit there." (Tr. 396-97). Plaintiff could not have performed this job in the 1990's because it would have been too difficult for her to button her client's clothes or to help her up. (Tr. 397).

14

A VE was asked by the ALJ to consider a hypothetical person of Plaintiff's age and education (high school), who had a moderately limited ability to concentrate, was limited to simple tasks at the light exertional level, and had to avoid repetitive fingering and fine hand manipulation. The VE testified that such a person could perform light and unskilled jobs that existed in significant numbers in the national economy, including counter clerk, furniture rental consultant, and children's attendant in amusement or recreation. (Tr. 403-04).

### 2. ALJ's Findings

The third ALJ found that Plaintiff had the following "severe" impairments during the relevant time period: "carpal tunnel syndrome and depressive disorder." (Tr. 322). He further found, despite the fact that Plaintiff's impairments "could reasonably be expected to produce the alleged symptoms," that Plaintiff's allegations were "not entirely credible." (Tr. 325). He concluded that Plaintiff had the residual functional capacity to perform light work, including the ability to climb ramps and stairs frequently; occasionally crawl and balance; frequently stoop, kneel, and crouch; and occasionally engage in repetitive fingering and handling. She was limited, however, to simple tasks involving only a moderate ability to maintain attention and

15

concentration, and should not work with ropes, ladders, or scaffolds. "Moderately limited" is defined in this context as a limitation or impairment that affects, but does not preclude, the ability to function in the specified area. Finally, the ALJ concluded that, although Plaintiff could not perform her past work, she could have performed, during the relevant time period, the alternative "light" jobs identified by the VE at the third administrative hearing, and she was therefore not disabled. (Tr. 325-26).[2]

## II.    DEFINITION OF "DISABILITY" AND BURDEN OF PROOF

An individual is considered disabled for purposes of disability benefits if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

---

[2]At one point, the ALJ stated that Plaintiff had the residual functional capacity for a "full range" of light work and that a finding of "not disabled" was "directed" by the Medical-Vocational Guidelines. (Tr. 326). Plaintiff concedes that this is most likely a "word-processing glitch" that does not reflect the ALJ's real rationale, in view of his immediately-preceding discussion of the VE's testimony and the "framework" rationale for applying VE testimony under Social Security Rulings 83-12, 83-14, and 85-15. (Tr. 326; Doc. 10 at 12, n. 2).

AO 72A
(Rev.8/82)

The burden of proof in a disability case is divided between the claimant and the Commissioner. The claimant bears the initial burden of establishing the existence of a disabling condition by demonstrating that she is unable to perform her former type of work. Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983). Once the claimant has met this burden, the burden of production shifts to the Commissioner to show that, considering the claimant's age, education, work experience, and impairment, other jobs exist in the national economy that the claimant can perform. See Boyd, 704 F.2d at 1209. The overall burden of persuasion, however, remains with the claimant to prove that she is unable to perform any of the jobs suggested by the Commissioner. See id.

## III.    STANDARD OF REVIEW

In reviewing the Commissioner's decision, this Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991). The Court's only role is to determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982); 42 U.S.C.

17

§ 405(g).  "Substantial evidence" means such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Richardson v. Perales, 402 U.S. 389, 401 (1971).  It may be present even if a preponderance of the evidence weighs in favor of the claimant.  Barnes, 932 F.2d at 1358.

## IV.   DISCUSSION

### A.    The ALJ did not fail to evaluate Dr. Shepherd's opinion

Plaintiff correctly notes that the purpose of the remand was for the ALJ to "re-assess Plaintiff's level of education and intellectual functioning and [to] give reasons for the decision."  Plaintiff  argues that the ALJ failed to evaluate Dr. Shepherd's opinion regarding her level of education and intellectual functioning.  However, Plaintiff does not identify the specific opinion or opinions of Dr. Shepherd that the ALJ purportedly failed to evaluate.  Furthermore, Dr. Shepherd never opined that Plaintiff's level of education and intellectual functioning would preclude her from performing all types of work.

Plaintiff does not point to any insufficiency in the ALJ's summary of Dr. Shepherd's findings.  Furthermore, the ALJ discussed the effects of Plaintiff's

18

borderline intellectual functioning later in his opinion. He noted that, despite Plaintiff's limited intelligence, she was able to work for 16 years at Rich's in computer auditing, had graduated from high school, had helped her children with their homework, had worked on crossword puzzles, had read the Bible, and had returned to work in 1999 as a care giver. Although these observations were made in the paragraph of the ALJ's opinion that mentions Dr. Hedeen's diagnosis of borderline intellectual functioning, the observations also implicitly and logically address Dr. Shepherd's assessment of Plaintiff. The ALJ's observations imply that, despite Dr. Shepherd's various assessments of Plaintiff's low intellectual functioning, Plaintiff was not precluded from performing all types of work. In sum, by including Dr. Shepherd's findings in his opinion, by documenting observations that contradict any suggestions in Dr. Shepherd's findings that Plaintiff could not work, and by limiting Plaintiff to "simple" work, the ALJ acknowledged and adequately addressed Dr. Shepherd's findings. Cf. Howard v. Massanari, 255 F.3d 577, 583 (8th Cir. 2001) (finding that ALJ properly accounted for claimant's borderline intellectual functioning by including in his hypothetical a limitation to simple, routine, or repetitive tasks).

**B.** **The ALJ's failure to make required findings about Plaintiff's mental impairments does not require remand**

Plaintiff argues that remand is required because the third ALJ did not attach a Psychiatric Review Technique Form ("PRTF") to his final decision, or alternatively, because he did not incorporate that form's mode of analysis into his written decision. (Doc. 10 at 22-23). When a medically determinable mental impairment is present, the ALJ must either attach a PRTF form to the decision, or incorporate that form's mode of analysis into the decision. Moore v. Barnhart, 405 F.3d 1208, 1213-14 (11th Cir. 2005); 20 C.F.R. § 404.1520a(a). The PRFT mode of analysis is part of the "special technique" that the Commissioner must use to rate the severity of a mental impairment. See 20 C.F.R. § 404.1520a(b). That technique requires the Commissioner to consider the degree of functional limitation caused by the mental impairment in four broad categories: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. See 20 C.F.R. § 404.1520a (c)(3).

The facts of Moore bear some similarities to the case presently before me. The plaintiff in Moore had been denied benefits after a remand and had again sought judicial review. The ALJ's initial decision included a PRTF, but his decision after remand did not. See 405 F.3d at 1214. The Court of Appeals for the Eleventh Circuit concluded that the second ALJ had erred by not attaching a PRTF or incorporating its

mode of analysis in his opinion. Id. Similarly, in the present case, the first ALJ completed a PRTF (Tr. 21), and the second ALJ incorporated the PRTF into her mode of analysis (Tr. 202), but the third ALJ did not complete a PRTF and, as the Commissioner concedes, did not incorporate the PRTF mode of analysis into his decision.

In spite of these similarities between Moore and the present case, the Commissioner argues, and I find, that the third ALJ did not commit reversible error under the unique circumstances of this case. First, this case can be distinguished from Moore on a number of grounds. That case required the ALJ to consider the claimant's ability to work through the date of his second decision. By 2006, in contrast, when the third administrative hearing occurred in this case, Plaintiff had long since resumed working, thereby limiting the ALJ's decision to a closed period of time preceding even the second administrative hearing. Furthermore, unlike Moore, Plaintiff presented no new evidence to the Commissioner regarding the effects of her depression during the closed period. The following passage from Moore demonstrates the importance of this distinction:

> [T]he fact that the ALJ complied with the PRTF method and regulations when he first evaluated Moore's claim in 1996, prior to remand, is not sufficient to excuse his failure to do so here. *Particularly where Moore has presented*

21

> *non-frivolous evidence suggesting that her mental condition has deteriorated since the vacated 1996 decision*, the ALJ's prior evaluation is insufficient to deny Moore another evaluation of her mental impairments' effect on her RFC through the date of the ALJ's 2001 decision.

<u>Moore</u>, 405 F.3d at 1214 (emphasis added).

Furthermore, the third ALJ did evaluate Plaintiff's ability to concentrate and made substantially the same findings in this regard as the second ALJ, that is, that Plaintiff had moderate difficulty in maintaining attention and concentration. Of the four areas included in the PRTF mode of analysis, concentration difficulty was the one which Plaintiff had emphasized in her previous appeal. (<u>See</u> Tr. 202-03, 324).[3] (As discussed below, the ALJ's finding of moderate restriction in this area is supported by substantial evidence.)

With respect to the remaining three areas of functioning covered by the PRTF, both the first and second ALJs found mild or no restrictions in these three areas

---

[3]The first remand order (by Judge Story) noted that Plaintiff had made two arguments: (1) that insufficient evidence supported the ALJ's finding that Plaintiff could perform medium work; and (2) that the ALJ failed to include limitations on Plaintiff's concentration in the VE hypothetical. (Tr. 240). Judge Story agreed with Plaintiff's argument about medium work based on her physical limitations. He also required the ALJ to include concentration deficiencies in the hypothetical to the VE. No mental restrictions other than concentration deficiencies were mentioned in Judge Story's remand order.

AO 72A
(Rev.8/82)

(activities of daily living, social functioning, and episodes of decompensation). It is obvious that the third ALJ would not have found more severe restrictions in these areas than the first or second ALJ, especially when neither the first nor second remand order mentioned them as matters that needed reconsideration. Under these unique circumstances, remand for a new PRTF would be a waste of government resources. Cf. Ware v. Schweiker, 651 F.2d 408, 412 (5th Cir. Unit A Jul. 1981) (finding that, although ALJ should have mentioned claimant's subjective complaints, remand would have been "a wasteful corrective exercise" where no further findings could be made capable of altering the ALJ's determination); Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000) ("While an error of law by the ALJ may necessitate a remand . . . a remand is not essential if it will amount to no more than an empty exercise"); Kobetic v. Comm'r of Soc. Sec., 114 Fed. Appx. 171, 173 (6th Cir. 2004) ("When 'remand would be an idle and useless formality,' courts are not required to 'convert judicial review of agency action into a ping-pong game.'") (quoting NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766, n. 6 (1969)).

23

Finally, although not necessary for my above finding, it is important to note that the parties reached an agreement on what the ALJ was to do on remand. They agreed that the remand was for (1) a supplemental hearing, at which Plaintiff would be allowed to testify and present evidence; (2) reassessment of Plaintiff's intellectual functioning; and (3) obtainment of accurate information from a vocational expert. (Tr. 335-36). The terms of the parties' agreement did not require the ALJ to complete another PRTF or to incorporate the PRTF into his mode of analysis. In other words, Plaintiff agreed to narrow the issues on remand. She thus has no basis to complain that the ALJ acted within the scope of the remand order. Cf. Ruiz v. Apfel, 24 F.Supp.2d 1045, 1050, n. 6 (C.D. Cal. 1998) (refusing to allow plaintiff to raise prior unsuccessful argument that was beyond the scope of the remand order).

### C.   The ALJ adequately re-evaluated Plaintiff's educational achievements and intellectual functioning

Plaintiff argues that the ALJ did not comply with that part of the remand order directing the Commissioner to reassess Plaintiff's level of education and intellectual functioning and to obtain appropriate VE testimony. The Court disagrees.

As stated above, the ALJ discussed the effects of Plaintiff's borderline intellectual functioning. He noted that, despite Plaintiff's limited intelligence, she was

24

able to work for 16 years at Rich's in computer auditing, to graduate from high school, to help her children with their homework, to work on crossword puzzles, to read the Bible, and to return to work in 1999 as a care giver.

Plaintiff argues that these findings are insufficient to sustain the ALJ's conclusions because those conclusions are based on an incorrect assumption by the vocational expert. In particular, she argues that the ALJ could not rely on the VE's opinion about jobs Plaintiff could perform because the VE stated that Plaintiff had a high school education. (Doc. 10 at 24-5; Tr. 400). Plaintiff points out that, despite her high school degree, the evidence shows that she had a second grade reading level, fifth grade math abilities, and borderline intellectual functioning. Plaintiff cites regulations stating that a claimant's educational abilities may be lower than the grade level completed in school, and that a second to fifth grade level of functioning equates to a "marginal education," which is two levels below a "high school education." (Doc. 13 at 10, citing 20 C.F.R. § 404.1564(b)).

However, the regulations cited by Plaintiff equate a "high school education" with the ability to do "semi-skilled through skilled work." A "marginal education" is equated with the ability to do "simple, unskilled types of jobs." 20 C.F.R. § 404.1564(b)(2), (4). The VE assumed that Plaintiff could perform only "simple"

tasks. (Tr. 405).[4] This limitation precluded her from returning to her past, semi-skilled job. (Id.). Thus, the VE's mention of Plaintiff's high school education can only be interpreted as acknowledgment that Plaintiff had graduated from high school (an undisputed fact), not that she had performed academically at the high school level. Any reference by the VE to Plaintiff's high school education was therefore harmless. Cf. Howard, 255 F.3d at 583 (finding that ALJ properly accounted for claimant's borderline intellectual functioning by including in his hypothetical the qualification that she was only capable of performing simple, routine, repetitive tasks).

The Commissioner argues that under the "Grid Rules," Plaintiff's alleged illiteracy had no affect on her ability to work a significant number of jobs. The Commissioner's reference is to the Medical-Vocational Guidelines, which provide rules for determining disability when certain factors are present. See 20 C.F.R., Pt. 404, Subpt. P., App. 2. Although those guidelines are not directly applicable in this case, they nonetheless can be used to "provide a framework for consideration of how much the individual's work capability" has been diminished. Id., Rule 200.00(e)(2).

---

[4]Dr. Hedeen, who concurred with Dr. Shepherd's assessment of Plaintiff's low test scores and academic achievements, opined that Plaintiff was unlimited in her ability to understand, remember, and carry out simple job instructions. (Tr. 354). Dr. Shepherd opined that Plaintiff had a good (i.e., "limited, but satisfactory") ability in the same category. (Tr. 169).

AO 72A
(Rev.8/82)

Table 2 of the Guidelines indicates that an individual up to age 44, who is illiterate or unable to communicate in English, has an unskilled work background, and is limited to light work, is (absent some other limitation) not disabled. Id., Rule 202.16. Even if limited to sedentary work, Table 1 indicates that such a younger individual, who is illiterate or unable to communicate in English, is (again, absent some other limitation) not disabled. Id., Rule 201.23.

Plaintiff replies that, while the Medical-Vocational Guidelines take into account her educational functioning, they do not account for her borderline intellect. She argues that, although borderline intellect and educational functioning are related, borderline intellect affects not only academic skills, but also life skills such as following instructions, dealing with unfamiliar situations, learning new tasks and perceiving social subtleties. (Doc. 13 at 8). Even if Plaintiff is correct, because of the relatedness of illiteracy and borderline intellect, the Medical-Vocational Guidelines were nevertheless appropriately used as a "framework" in this case.

Plaintiff further argues that the ALJ did not discredit Dr. Hedeen's or Dr. Shepherd's diagnosis of borderline intellectual functioning and second-to-fifth-grade educational functioning. (Doc. 13 at 10). However, the ALJ did not reject these findings. He simply found that, despite these findings, the evidence of Plaintiff's past

AO 72A
(Rev.8/82)

work at Rich's, her activities that involved some reading ability, and her ability to perform her current work, all supported the conclusion that she could perform simple work.

**D.     The ALJ's mental RFC finding is supported by sufficient evidence**

Plaintiff contends that the ALJ's finding that she experienced only moderate difficulty in maintaining attention and concentration is not supported by substantial evidence, especially given evidence regarding her depression.  (Doc. 10 at 28-32). She argues that Dr. Shepherd's mental RFC was the only RFC during the relevant time period, and that if accepted by the ALJ, it would have resulted in a finding that Plaintiff was disabled.  As set forth above, Dr. Shepherd found that Plaintiff was "fair" (defined as "seriously limited, but not precluded") in up to eight different areas of work-related mental functioning, including "maintain attention/concentration." (Tr. 168).  The VE testified that an individual with *serious* limitations in handling work stress, paying attention, and behaving in an emotionally stable manner would be unable to maintain employment.  (Tr. 408).

Again, the agreed-upon purpose of the remand was for the ALJ to "re-assess Plaintiff's level of education and intellectual functioning and [to] give reasons for the

28

decision." Plaintiff's residual functional capacity with respect to different areas of work-related mental functioning or her depression was not mentioned in the consent order notwithstanding the second ALJ's finding of only moderate difficulties in concentration. (Tr. 202). Thus, the ALJ was not required to revisit any limitations brought about by Plaintiff's depression.

In any event, the ALJ's finding regarding Plaintiff's mental residual functional capacity is supported by substantial evidence. The ALJ noted that Plaintiff had not sought any regular treatment from a mental health professional for her depression, had not taken any psychiatric medication, and had continued to perform routine and normal activities both inside and outside of her home environment. (Tr. 325). While Plaintiff cited evidence of one prescription for Restoril and one for Prozac during a June 12, 1995 doctor's visit, no evidence supports a finding that these prescriptions were ever filled. Furthermore, the physician who prescribed the medications was not a mental health specialist. At the third administrative hearing, Plaintiff denied that she had ever seen a doctor or taken medication for depression. (Tr. 398).

In addition, Plaintiff told Dr. Shepherd that she did all of the food preparation at home, including making snacks, washing dishes, cleaning the house, and doing the family laundry. She told him that she dresses and bathes daily, goes to church weekly,

AO 72A
(Rev.8/82)

talks on the phone to various people, watches television, reads the Bible and newspaper, goes out to eat, window shops, and likes to do crossword puzzles. (Tr. 165). On this record, the ALJ had a substantial basis for concluding that Plaintiff had only moderate limitations of concentration.

V.    **CONCLUSION**

For the foregoing reasons, the Commissioner's final decision denying Plaintiff's application for disability benefits is **AFFIRMED**.

**IT IS SO ORDERED** this 18th day of August, 2008.

T:\FINAL.SS\Young.BTY.wpd

_Gerrilyn G. Brill_
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)